IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| Orlando O. Monroe, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21cv524 (TSE/TCB) |
| | ) | |
| Riverside Regional Jail, et al., | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Orlando O. Monroe ("Monroe" or "Plaintiff"), proceeding pro se, filed a civil action

pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while detained at the

Riverside Regional Jail ("RRJ") on December 29, 2020, by RRJ; Larry Leabough, RRJ's

Superintendent; Lt. Herman Massenburg; and Maj. Charles Armstrong. [Dkt. No. 1]. The Court

screened the complaint on June 23, 2021, and found that the complaint failed to state a claim

upon which relief could be granted and directed Monroe to file an amended complaint. [Dkt. No.

11]. Monroe filed an amended complaint on July 7, 2021, which named three defendants:

Leabough, Massenburg, and Armstrong. [Dkt. No. 15]. The Court screened the amended

complaint on July 9, 2021 and dismissed defendant Leabough without prejudice, and directed

that defendants Massenburg and Armstrong be served. [Dkt. No. 17].[1]

The amended complaint alleges that on December 29, 2020, at approximately 4:28 p.m.,

Monroe, an inmate at the RRJ, was sprayed with oleoresin capsicum spray ("OC") by

Massenburg. Sgt. Taylor helped Monroe wash his eyes out at a sink, and Armstrong took over

assisting Monroe at the sink. Armstrong attempted to place Monroe in handcuffs, Monroe

_____

[1] The Court dismissed RRJ without prejudice as well because Monroe had not named RRJ as a defendant in the amended complaint. [Dkt. No. 17 at 1].

resisted, and Armstrong took Monroe (and himself) to the floor. A video of the incident (without audio) has been provided to Monroe and submitted to the Court as an exhibit in support of the motion for summary judgment.

Monroe alleges that Massenburg used excessive force in violation of his Eighth Amendment rights by spraying him with OC, and that Armstrong used excessive force in violation of his Eighth Amendment in using a "leg sweep" to subdue him while applying handcuffs. Defendants Massenburg and Taylor filed a motion for summary judgment, supported by exhibits on October 28, 2021 [Dkt. Nos. 32-33, 33-1 through 33-5, 36], arguing that their use of force was justified and reasonable, and that they are entitled to qualified immunity. Plaintiff has been afforded the opportunity to file responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) [Dkt. No. 32], and he has done so. [Dkt. Nos. 38-42, 50]. Accordingly, this matter is now ripe for disposition. For the reasons that follow, the defendants' motion for summary judgment must be granted.

## I. Pending Motions

Monroe has filed motions for witnesses, the video of the incident, RRJ documents, appointment of counsel, and for the Court to investigate. [Dkt. Nos. 19, 30, 38, 39-40, 41]. Monroe has a copy of the video and he relies upon that video in his opposition to the motion for summary judgment. The motion for the video [Dkt. No. 30] therefore must be denied as moot.

Monroe has also filed several conclusory motions with the names of "witnesses" [Dkt. Nos. 19, 39, 40], a request for documents [Dkt. No. 38], appointment of a lawyer [Dkt. Nos 39, 40], a request for an investigation [Dkt. No. 41], and two responses expressly opposing the motion for summary judgment. [Dkt. Nos. 45, 48].

Concerning his motion for appointment of counsel, Monroe "does not have a general right to counsel in a § 1983 action." Evans v. Kuplinski, 713 F. App'x 167, 170 (4th Cir. 2017) (citing Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Ct., 490 U.S. 296, 298 (1989)). The Court's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is discretionary, and, to qualify, an indigent claimant must present "exceptional circumstances." Id. Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." See Whisenant, 739 F.2d at 163 (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel). Here, Monroe set forth allegations that stated a claim, and has responded to the motion for summary judgment. Because Monroe has not set forth exceptional circumstances and does not appear to lack capacity to pursue his claims, Monroe's motions for appointment of counsel [Dkt. Nos. 39, 40], will be denied.

The purpose for filing motions that list witnesses is unclear, as is his request for documents from RRJ. [Dkt. Nos. 19, 38 -40]. In response to a motion for summary judgment, if the "nonmovant shows by affidavit or declaration that … it cannot present facts essential to justify its opposition," a "court may … defer considering the motion or … allow time to obtain affidavits or declarations or to take discovery." Fed. R. Civ. P. 56(d). If the nonmovant so shows, then the Court may defer or deny the motion. Hodgin v. UTC Fire & Sec. Americas Corp., 885 F.3d 243, 250 (4th Cir. 2018). Monroe, however, has not submitted a declaration or affidavit averring that anything associated with his various motions is essential to support his opposition to the motion for summary judgment. See Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.") (quoting Evans v. Techs.

3

Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). In addition to the absence of an

affidavit or declaration, Monroe's motions do not establish any relevance of the information

sought to the defendants' motion for summary judgment — in which: (i) Massenburg argues his

use of the OC was reasonable; (ii) Armstrong argues his use of the leg sweep was justified; and

(iii) both defendants argue that each is also entitled to qualified immunity. In short, there is no

averment that any evidence sought is essential for a response to the motion for summary

judgment. Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (where a motion for summary

judgment is pending, requests for discovery should be denied "if the additional evidence sought

for discovery would not have by itself created a genuine issue of material fact sufficient to defeat

summary judgment").[2] To the contrary, Monroe's position in his most recent filing is that the

video (alone) establishes that his rights were "violated." [Dkt. No. 48 at 5]. Accordingly, the

motions will be denied. [Dkt. Nos. 19, 38-40].[3]

## II. Statement Of Undisputed Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a

statement of material facts that they contend are undisputed. Monroe has not provided any sworn

or verified statements to contest the Defendants' undisputed facts, which are based upon

---

[2] The defendants have also filed a motion to strike [Dkt. No. 50] Monroe's reply [Dkt. No. 48] filed after the defendants filed their reply [Dkt. No. 46] to Monroe's brief in opposition [Dkt. No. 42] to their motion for summary judgment. Monroe's reply is repetitive of the arguments he previously raised and the motion to strike will be denied.

[3] Monroe references the subsequent disciplinary hearing related to the events involved in this case and alleges the charges against him were dismissed. [Dkt. No. 42 at 4-5]. Even if true, the action of the disciplinary hearing officer is not relevant to the Eighth Amendment analysis. Riccio v. Fairfax, 907 F.2d 1459, 1466 (4th Cir. 1990) ("a state does not necessarily violate the constitution every time it violates one of its rules"); see also Ewell v. Murray, 813 F. Supp. 1180, 1183 (W.D. Va. 1993) ("Even if state law creates a liberty interest, violations of due process are to be measured against a federal standard of what process is due.").

affidavits and an authenticated and unchallenged video. Accordingly, Monroe has failed to rebut

any of the facts set forth in Defendants' motion for summary judgment, Gholson v. Murray, 953

F. Supp. 709, 714 (E.D. Va. 1997), and the Court accepts Defendants' statement of facts as true.

See Integrated Direct Mktg., LLC v. May, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015) ("In

determining a motion for summary judgment, the Court may assume that facts identified by the

moving party in its listing of material facts are admitted, unless such a fact is controverted in the

statement of genuine facts in opposition to the motion.") (quoting E.D. Va. Loc. Civ. R. 56(B)),

aff'd, 690 F. App'x 822 (4th Cir. 2017); see also JDS Uniphase Corp. v. Jennings, 473 F. Supp.

2d 705, 707 (E.D. Va. 2007) (movant's statement of undisputed facts is deemed admitted where

nonmovant's response fails to "identify with any specificity which facts, if any, were disputed")

(citing E.D. Va. Loc. Civ. R. 56(B)).[4]

    1. Massenburg served in the Work Release and Home and Electronic Monitoring

Program at Riverside Regional Jail ("RRJ") [Dkt. No. 33-2 at ¶ 3], and has worked at RRJ since

April 20, 1998 [Id.]. At all times relevant in the Amended Complaint, Massenburg was the

Housing Unit Manager for Housing Unit 4D. [Id.].

---

[4] The record of admissible evidence includes defendants' affidavits, a video, and exhibits. [Dkt. Nos. 33-1 through 5, 36]. The video is approximately eleven minutes long and the incident begins around the 6:00 minute mark. References to the video will be noted as "Video at _:_." The video contains two views of the same incident. Monroe has not questioned the authenticity or accuracy of the video, and, as noted, he relies on it as well.

Neither the original complaint, the amended complaints, nor any of Monroe's other pleadings are verified. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (verified pleadings are the "equivalent of an affidavit"). Monroe's December 20, 2021 Reply in Opposition [Dkt. No. 48] does not satisfy the requirements of 28 U.S.C. § 1746, but the Court will consider his admissions in the reply only to the extent they do not conflict with the video. See Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) (at the summary judgment stage, "where … the record contains an unchallenged videotape capturing the events in question," a court need "only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape") (citing Scott v. Harris, 550 U.S. 372, 380 (2007)). The Court will not credit the numerous hearsay statements Monroe has included in his reply. See Greensboro Professional Firefighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995) (hearsay "is neither admissible at trial nor supportive of an opposition to a motion for summary judgment."). In addition, although not sworn, many of the factual assertions Monroe includes in his arguments are refuted by the video of his interactions with Massenburg and Armstrong.

2. On May 14, 2020, Monroe was arrested and became an inmate at RRJ [Id. at ¶ 4]. On

August 16, 2021, Monroe was transferred from RRJ to St. Bride's Correctional Center. [Id.].

3. On December 29, 2020, Monroe was housed in Housing Unit 4D. [Id. at ℙ 5].[5] At

approximately 4:25 p.m. that day, Massenburg entered Unit 4D and stood behind the Officer's

station during pill call. [Id.]. At that time, the daily announcement was made, which instructed

inmates to return to their cells after they picked up their medication due to COVID-19 protocols.

[Id.].

4. Massenburg was behind the Officer's station when Monroe approached him while

holding a tray. [Id. at ¶ 6]; (Video at 6:07).[6] Monroe asked when the COVID-19 protocol would

end and Massenburg told Monroe to "lock down" and return back to his cell as Monroe had been

instructed to do by the daily announcement. [Dkt. No. 33-2 at ¶ 6]. Monroe was offended by

Massenburg's response and did not comply and return to his cell. [Id.]. Massenburg then

repeated his instruction to "lockdown" and pointed toward Monroe's cell. [Id.]; (Video at 6:13).

5. Monroe stepped closer to the Officer's station where Massenburg was positioned and

placed his tray on the Officer's station countertop. [Dkt. No. 33-2 at ¶ 7]; (Video at 6:15-17).

Massenburg then left the Officer's station, and as he approached Monroe, Monroe pulled up his

pants and clinched his fists by his side. [Dkt. No. 33-2 at ¶ 8]; (Video at 6:17-19). Massenburg

---

[5] The Virginia Case Information website, see https://www.vacourts.gov/main.htm, (click on Case Status and Information, Circuit Court, Prince George County) (search Monroe, Orlando) (last viewed Feb. 8, 2022), indicates that Monroe was convicted of a felony offense (Va. Code Ann. § 18.2-472.1, failing to register as a sex offender) and sentenced to five years with four years suspended on October 8, 2020, Commonwealth v. Monroe, Case No. CR20000331-00 (Cir. Ct. Prince George County). See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) ("most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.") (collecting cases); see, e.g., Lynch v. Leis, 382 F.3d 642, 647 & n.5 (6th Cir. 2004) (taking judicial notice of state court records available to public online). Monroe was, therefore, not a pretrial detainee on December 29, 2020.

[6] Monroe states that Massenburg was seated behind the Officer's station and jumped up, but the video shows that Massenburg was never seated while at the Officer's station and that his physical actions were consistent with pointing at Monroe's cell. [Dkt. No. 42 at 1]; (Video at 5:41 to 6:15). Accordingly, the video controls, Iko, 535 F.3d at 230, and there is no genuine dispute of material fact.

again advised him to "lockdown" and pointed toward Monroe's cell. [Dkt. No. 33-2 at ¶ 7];

(Video at 6:20-22). Monroe did not comply and Massenburg pointed for Monroe to go to his cell

again. (Video at 6:21-28). Monroe still did not comply.[7]

6. Sergeant Thurman Taylor ("Taylor") observed the confrontation and arrived while

Massenburg was still pointing to Monroe's cell. Taylor put his left hand on Monroe's left

shoulder and right hand on Monroe's right hip and then stepped in between Massenburg and

Monroe. (Video at 6:28-30 ). Massenburg told Monroe for the fourth time to lockdown in his cell

and pointed to his cell. [Dkt. No. 33-2 at ¶ 8]; (Video at 6:30-33). Taylor, who was still between

Massenburg and Monroe, also told Monroe to lockdown. Taylor had his arms extended and his

hands were on Monroe's chest. (Video at 6:30-33).

7. Monroe then raised both of his arms, and broke free from Taylor's grasp. (Id. at 6:33-

35).[8] As Monroe broke away from Taylor, Massenburg deployed OC spray towards Monroe for

no more than one second. (Id. at 6:36).[9]

8. Massenburg followed Monroe as Monroe headed back to his cell. Monroe turned and

lunged at him and Massenburg sprayed Monroe with the OC spray.[10] Again, the duration of the

_____

[7] Monroe argues in opposition to the motion for summary judgment that Massenburg never told him lockdown, and there was no announcement. [Dkt. No. 48 at 2]. Monroe admitted in his original complaint and amended complaint that Massenburg, as well as Taylor, had told him to lockdown while both were on the same side of the Officer's station. [Dkt. Nos. 1 at 4; 15 at 5].

[8] In an unverified pleading, Monroe argues that he had picked up the tray when he broke free from Taylor [Dkt. No. 48 at 3], but the video clearly shows the tray remained on the Officer station counter, and was still there when Armstrong escorted Monroe to the medical unit for decontamination. (Video at 6:35-40, 9:57 to 10:04). The tray never moved after Monroe placed it on the counter. Further, in another unverified pleading, Monroe argues that he and Taylor "were turning around with the tray" when Massenburg "maced [him]." [Dkt No. 42 at 2]. The video, however, shows that Monroe was not holding the tray when he broke free from Taylor's grasp, that he was not turning away, and that he was facing Massenburg. It was at that point that Massenburg sprayed the OC. (Video at 6:33-36). Accordingly, the video controls, Iko, 535 F.3d at 230, and there is no genuine dispute of material fact.

[9] The Use of Force policy in effect allowed for OC, a chemical agent, to "be dispersed only in the amounts sufficient to gain control of the subject or situation" and, in pertinent part, "to enforce policy and facility rules and directives." [Dkt. No. 33-3 at 11, 12].

[10] Monroe alleges that Massenburg sprayed him with the OC spray a second time at this point. Massenburg has not admitted or denied it. The tape does show Massenburg extend his right arm as Monroe lunges toward him and then

7

spray was for no more than one second. [Dkt. No. 33-2 at ¶ 10]; (Video at 6:42-43). Monroe

turned back towards the stairs and Taylor followed and assisted Monroe as he climbed the stairs

back toward his cell. (Video at 6:48 to 7:00). After Monroe conversed with Taylor for

approximately thirty seconds and telling Taylor his eyes were burning, Taylor led Monroe back

down the stairs and to a sink on the first floor to allow Monroe to rinse his face/eyes in a sink.

[Dkt. Nos. 33-2 at ¶ 10; 48 at 3-4]; (Video at 7:30 to 8:12).

9. On December 29, 2020, at approximately 4:28 p.m., Armstrong, the Director of Inmate

Services and Support at RRJ, responded to Housing Unit 4D because he had heard loud yelling

over the radio. [Id. at ¶¶ 3, 4]; (Video at 8:19). When Armstrong arrived, Massenburg pointed

him toward Taylor who was holding Monroe from behind and flushing Monroe's eyes over the

sink. [Id.]. Armstrong advised Taylor to place Monroe in handcuffs. [Dkt. No. 33-4 at ¶ 4].

Taylor told Armstrong that he had been affected by the OC spray and asked "if [Armstrong] had

Inmate Monroe." [Id.]; (Video at 8:19-45).

10. Armstrong then held Monroe's left hand behind his back and the back of Monroe's

shirt, and instructed him to sit down because he needed to place Monroe in handcuffs. [Id. at ¶

5]. Monroe became agitated and asked why he needed to be placed in handcuffs and stated that

he had done nothing wrong. [Id.]. Armstrong repeated his instruction and ordered Monroe to sit

down. [Id. at ¶ 6]; (Video at 9:01-10).

11. Monroe did not comply and began to pull away from Armstrong. (Video at 9:10-11).

Armstrong then took Monroe (as well as himself) to the floor in a controlled manner utilizing a

---

Monroe recoils and turns back toward the stairs. (Video at 6:42-43). For purposes of this motion, the Court will
assume that Massenburg sprayed Monroe a second time when Monroe lunged at him.

maneuver called a leg sweep. (Video at 9:12-14).[11] At that time, Sergeant Keith Holloway

assisted Armstrong in placing handcuffs on Monroe. [Dkt. No. 33-4 at ¶ 6]; (Video at 9:13-33).

12. After Monroe stood up, Armstrong escorted him to the Medical Department where he

was further decontaminated and then to the Special Housing Unit. [Dkt. Nos. 33-4 at ¶ 7; 33-5];

(Video at 10:00-18). Monroe admits that he was taken to the medical unit for decontamination.

[Dkt. Nos. 42 at 5; 48 at 44].

### III. Standard of Review

It is well settled that a motion for summary judgment should be granted only "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish that there

are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of

law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving

party need only demonstrate that there is a lack of evidence to support the non-movant's claim.

See Celotex, 477 U.S. at 323-25. In response to such a showing, the party opposing summary

judgment must go beyond the pleadings and proffer evidence that establishes each of the

challenged elements of the case, demonstrating that genuine issues of material fact do exist that

---

[11] Monroe argues that Armstrong "took [Monroe] to the floor hard." [Dkt. No. 15 at 7]. While the video establishes
that Monroe went to the floor as a result of the leg sweep, it does not show him going to the "floor hard" or being
"slam[med]." [Dkt. No. 48 at 1]. Armstrong used both of his arms to grab Monroe when he had first attempted to
place the handcuffs on Monroe, and he maintained his grip on Monroe with both of his arms as the two went to the
floor. The result of the leg sweep is better described as a controlled fall, with the resistance to gravity being supplied
by Armstrong's grip on Monroe.

must be resolved at trial. See id. at 324; Anderson, 477 U.S. at 248. The party who bears the

burden of proving a particular element of a claim must "designate 'specific facts showing there is

a genuine issue for trial'" with respect to that element. Celotex, 477 U.S. at 324 (quoting Fed. R.

Civ. P. 56(e)).

The non-moving party, however, must show more than some metaphysical doubt as to

the material facts. "[T]he non-moving party 'may not rest upon mere allegation or denials of his

pleading but must set forth specific facts showing that there is a genuine issue for trial.'" Hughes

v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 256). Conclusory

allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a

scintilla of evidence will not carry this burden. See Anderson, 477 U.S. at 249-50. There must be

evidence on which the jury could reasonably find for the non-moving party. Id. at 252. The

judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a

preponderance of the evidence that the opposing party is entitled to a verdict.

When a defendant moves for summary judgment on ground that a plaintiff lacks evidence

of an essential element of his claim, plaintiff is required, if he wants to ward off grant of the

motion, to present evidence of evidentiary quality (either admissible documents or attested

testimony, such as that found in depositions or in affidavits) demonstrating existence of genuine

issue of material fact; evidence need not be in admissible form, but it must be admissible in

content, in sense that change in form but not in content, would make evidence admissible at trial.

See Celotex, 477 U.S. at 324. Hearsay "is neither admissible at trial nor supportive of an

opposition to a motion for summary judgment." Greensboro, 64 F.3d at 967. Such "second-

hand" information learned from others fails to satisfy a plaintiff's burden "to survive a motion

for summary judgment." <u>Monk v. Potter</u>, 723 F. Supp. 2d 860, 875, 878 (E.D. Va. 2010) (citing

<u>Greensboro</u>, 64 F.3d at 967; <u>Riggs v. Airtran Airways, Inc.</u>, 497 F.3d 1108, 1121 (10th Cir.

2007) (noting statements conveyed to plaintiff were "second-hand" and inadmissible hearsay in

opposition to summary judgment); <u>Lemmons v. Georgetown Univ. Hosp.</u>, 431 F. Supp. 2d 76,

89-90 (D.D.C. 2006) (purported events related by plaintiff in her own deposition were based on

second-hand information rather than personal knowledge and were therefore inadmissible

hearsay for summary judgment purposes); Fed. R. Civ. P. 56(e) (supporting or opposing

summary judgment affidavits must be based on "personal knowledge")).

## IV. Analysis

The Eighth Amendment prohibits prison officials from unnecessarily and wantonly

inflicting pain on prisoners. <u>Hill v. Crum</u>, 727 F.3d 312, 317 (4th Cir. 2013); <u>see also</u> <u>Whitley v.</u>

<u>Albers</u>, 475 U.S. 312, 319 (1986). Monroe alleges that Massenburg's and Armstrong's actions

were not justified and to prove an excessive force claim, he must show: (1) that the prison

official's use of force was objectively harmful such that it violates contemporary standards of

decency; and (2) that the prison official's use of force was not "applied in a good-faith effort to

maintain or restore discipline," but was intended to "maliciously and sadistically ... cause harm."

<u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992). It is the nature of the force used, and not the extent

of the injury caused, that serves as the relevant inquiry. <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 34

(2010).

The subjective portion of an excessive force claim requires Monroe to demonstrate that

the defendants inflicted force sadistically and maliciously for the sole purpose of causing harm.

<u>See</u> <u>Whitley</u>, 475 U.S. at 320-21. "The issue is therefore not whether the use of force was

absolutely necessary in hindsight, but 'whether the use of force could plausibly have been

thought necessary, or instead evinced such wantonness with respect to the unjustified infliction

of harm as is tantamount to a knowing willingness that it occur.'" Griffin v. Hardrick, 604 F.3d 949, 954 (6th Cir. 2010) (quoting Whitley, 475 U.S. at 321). A court reviews the following factors to determine whether a defendant acted maliciously and sadistically: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. See Williams v. Benjamin, 77 F.3d 756, 762 (4th Cir. 1996) (citing Whitley, 475 U.S. at 321; Hudson, 503 U.S. at 7). In addition, the absence of serious injury is a relevant, but not entirely dispositive, factor to be considered in this subjective analysis. Id.

### A. Defendant Massenburg

In the context of the use of a chemical agent such as OC by prison staff, "[i]t is generally recognized that it is a violation of the [Fourteenth] Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." Iko v. Shreve, 535 F.3d 225, 240 (4th Cir.2008) (quoting Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir.1996) (emphasis omitted)). The use of a chemical agent is not "per se a cruel and unusual punishment," McCargo v. Mister, 462 F. Supp. 813, 818 (D. Md. 1978), and it may be used in order to control recalcitrant inmates. Williams, 77 F.3d at 763. Analysis regarding the amount of chemical agent used focuses, as with all other excessive force claims, on whether the defendant acted with a sufficiently culpable state of mind. Iko, 535 F.3d at 238 (4th Cir.2 (citations omitted) (holding correctional officer not entitled to qualified immunity where additional chemical agent was deployed into inmate's cell after inmate attempted to comply with officer's order, did not react violently, and officer failed to remove inmate's clothes or secure medical care for inmate after chemical agent exposure).

Courts have also concluded that the Eighth Amendment can be violated when, after a prisoner is subjected to a chemical agent, even for a legitimate reason, the officers then withhold appropriate medical attention. Wagner v. Warden, No. ELH-14-791, 2016 U.S. Dist. LEXIS 170433, *27 (D. Md. Dec. 8, 2016) (citing Walker v. Bowersox, 526 F.3d 1186, 1189 (8th Cir. 2008) (finding Eighth Amendment violation where prisoner was barred from showering or changing for three days after pepper spray incident)). In addition, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005).

Here, in accordance with an announcement, Massenburg instructed Monroe on four separate occasions to return to his cell and lockdown. Monroe took an aggressive stance with clenched fists and Taylor stepped in between Massenburg and Monroe. Monroe pushed Taylor's arms down, freeing himself from Taylor's grasp, and at that point Massenburg deployed the OC spray. After a short time, Monroe headed toward his cell and Massenburg followed. After a few steps, Monroe turned and lunged towards Massenburg and Massenburg sprayed Monroe with the OC a second time. Monroe turned and started back toward his cell. On both occasions, the video establishes that the OC spray was administered for no more than one second. (Video at 6:35-36; 6:42-43).[12] Over the next two minutes, Taylor trailed Monroe as he went up the stairs, he

---

[12] The Seventh Circuit has held that "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain," but that "[t]he use of mace, tear gas or other chemical agents of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhumane punishment ... and this is so whether the inmate is locked in his cell or is in handcuffs" because "[t]he use of the substance in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984). The Fourth Circuit is of a similar mind and closely scrutinizes, as does this Court,

> the use of tear gas or mace .... This is because, even when properly used, such weapons "possess inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim." Accordingly, although it is not per se unconstitutional for guards to spray mace at prisoners confined in their cells, it is necessary to examine the "totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used [to]

13

conversed with Monroe, and then he led Monroe back down the stairs, across the unit to the sink, and directed Monroe to rinse his eyes under the water from the sink.

Armstrong entered Unit 4D, saw Taylor and Monroe by the sink, and advised Taylor to place Monroe in handcuffs. [Dkt. No. 33-4 at ¶ 4]. Taylor told Armstrong that he had been affected by the OC spray and asked "if [Armstrong] had Inmate Monroe." [Id.]; (Video at 8:19-45). Armstrong put Monroe's left arm behind his back and held the back of Monroe's shirt with his right hand. Monroe had been rinsing his eyes for approximately thirty seconds at this point. Armstrong told Monroe to sit down so he could handcuff Monroe. Monroe did not comply, and Armstrong directed Monroe a second time to sit down. Again, Monroe did not comply. Monroe began to pull away from Armstrong and at that point, Armstrong used a leg sweep maneuver and both he and Monroe went to the floor. After the handcuffs were secured, Armstrong and another officer assisted Monroe until he as standing and then they escorted Monroe to the medical unit for additional decontamination.[13]

Under the undisputed facts, a reasonable jury would not find Massenburg's use of the OC spray violated the Eighth Amendment. Prior to the first use of OC spray, Monroe had ignored at least five orders to return to his cell and lockdown, Monroe also clenched his fists when Massenburg approached and he broke free form Taylor's grasp just prior to being sprayed.

---

determine the validity of the use of tear gas in the prison environment."

However, mace can be constitutionally used in small quantities to "prevent riots and escapes" or to control a "recalcitrant inmate." A limited application of mace may be "much more humane and effective than a flesh to flesh confrontation with an inmate."

Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996) (citations omitted).

[13] A plaintiff may not survive summary judgment by relying on his unsubstantiated allegations in the face of sworn testimony to the contrary. See Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) ("[A] party cannot withstand summary judgment by relying solely on his own self-serving allegations unsupported by any corroborating evidence.") (citation omitted). The defendants' sworn affidavits and the video show a recalcitrant inmate refusing to follow repeated orders to lockdown prior to the first use of OC, and an inmate lunging at an officer that led to the second use of OC.

Thereafter, as he moved away from Massenburg and Taylor, Monroe turned and lunged at Massenburg (who had been trailing behind him as Monroe had walked toward the stairs). Massenburg then used the OC spray a second time in response to the lunge. Within less than two minutes, Taylor had Monroe at the sink rinsing his eyes, and Armstrong took Monroe to the medical unit for further decontamination. See Jennings v. Peiffer, 110 F. App'x 643, 646 (6th Cir. 2004) (officers did not act maliciously or sadistically in spraying a chemical agent to secure an inmate's compliance after the inmate questioned a direct order and refused to comply with order).

Because Monroe had failed to comply, force of some sort was needed to get Monroe into his cell as ordered. Massenburg and Taylor used words and then minimal physical touching (Taylor grasping his shoulders), which proved ineffective. When Monroe broke free from Taylor, Massenburg applied a higher level of force — the OC spray. Massenburg ceased using the OC spray within one second. Massenburg did not use the OC spray again until Monroe turned and lunged at him.[14] Again, Massenburg ceased spraying the OC after approximately one second when Monroe became compliant. Thereafter, Taylor led Monroe to the sink where Monroe rinsed his faced and Monroe was taken to the medical unit within minutes after rinsing his face for additional decontamination.[15]

_____

[14] The Sixth Circuit has upheld the use of chemical agents in the corrections setting on numerous occasions when inmates have refused to comply with orders. See Sams v. Quinn, No. 17-1419, 2017 U.S. App. LEXIS 20558, *7 (6th Cir. Sept. 7, 2017) (collecting cases).

[15] In one of his responses to the motion for summary judgment, Monroe appears to argue that because Massenburg did not take him to the sink immediately after he sprayed Monroe with the OC, that the delay amounted to a constitutional violation. [Dkt. No. 42 at 4]. To the extent Monroe seeks to amend his complaint by raising new matters in a response to a motion, he may not do so via a brief. See Hurst v. District of Columbia, 681 F. App'x 186, 194 (4th Cir. 2017) ("a plaintiff may not amend her complaint via briefing") (citing Commonwealth of Pennsylvania v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988)); Zachair, Ltd. v. Driggs, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (a plaintiff is "bound by the allegations contained in [his] complaint and cannot, through the use of motion briefs, amend the complaint."), aff'd, 141 F.3d 1162 (4th Cir. 1998). In any event, the delay in decontamination in this case was approximately one to two minutes. The Fourth Circuit has recently held delays of 45 to 50 minutes before an inmate was decontaminated after being sprayed with pepper spray does not state an "Eighth Amendment violation, because the objective prong is not satisfied." Moskos v. Hardee, ___ F.4th ___, ___, 2022 U.S. App. LEXIS 1711, *16 (4th

In addition, the affidavits and the video establish that the force used was applied in a good-faith effort to maintain order and to ensure compliance, and was not intended to cause harm. See Brooks v. Johnson, 924 F.3d 104, 113 (4th Cir. 2019) ("Corrections officers act in a 'good faith effort to maintain or restore discipline' - that is, with a permissible motive — not only when they confront immediate risks to physical safety, but also when they attempt to 'preserve internal order' by compelling compliance with prison rules and procedures.") (quoting Hudson, 503 U.S. at 6-7). As the Fourth Circuit explained in Williams, "[a] limited application of mace may be much more humane and effective than a flesh to flesh confrontation with an inmate. Moreover, prompt washing of the maced area of the body will usually provide immediate relief from pain." Williams, 77 F.3d at 763 (citing Soto v. Dickey, 744 F.2d 1260, 1262 (7th Cir. 1984)).

## B. Defendant Armstrong

With respect to the leg sweep used by Armstrong, Monroe's claim of excessive force also fails. Armstrong performed a leg sweep after Monroe had twice failed to sit so he could be handcuffed and then only after Monroe attempted to pull away from Armstrong. Monroe refused to comply with Massenburg's and Taylor's orders to return to his cell and lockdown, Monroe had lunged at Massenburg, and Monroe not only had failed to comply with Armstrong's orders

---

Cir. 2022).

> Medical care is often not immediate. Only the most fortunate are able to receive a doctor's appointment at the precise time they want it or medical attention at the very moment of arrival at a hospital. Waiting is often the name of the game. And actual treatment may not follow immediately upon medical attention, whether due to the caution of a prudent physician or the inevitable uncertainties of diagnosis. It would be wrong to turn the everyday inconveniences and frictions associated with seeking medical care into constitutional violations whenever they occur within the prison walls.
>
> Mere delay is therefore not enough. Rather, "[t]he objective prong requires [Moskos] to show that the alleged delay ... put him at a 'substantial risk' of 'serious harm.'"

Id. (citations omitted).

16

to sit down, Monroe had attempted to break free as Armstrong was trying to apply the handcuffs. Armstrong's use of a leg sweep was reasonable.[16] Armstrong's use of force was applied in a good-faith effort to maintain order and to ensure compliance, and was not intended to cause harm. See Brooks, 924 F.3d at 113; see also Griffin, 604 F.3d at 954-55 (concluding that where the detainee was attempting to pull away from jail officials, use of the "leg-sweep maneuver" to subdue the detainee was not "undertaken ... in a wanton manner, but [the officer] was acting as he was trained while attempting to gain control of [the defendant]"). The manner in which Armstrong and Monroe went to the floor was not wanton.

*          *          *

In summary, after reviewing the video and the sworn statements, the Court concludes that no reasonable jury could find that either Massenburg or Armstrong applied excessive force to a recalcitrant Monroe or that the force applied was applied "maliciously and sadistically for the very purpose of causing harm." Williams, 77 F.3d at 761.

### C. Qualified Immunity.

Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also Kentucky v. Graham, 473 U.S. 159, 165–67 (1985). Qualified immunity provides immunity from suit rather than a mere defense to liability, Mitchell v.

---

[16] See, e.g., Saidi v. Randall, No. CCB-19-1866, 2021 U.S. Dist. LEXIS 39104, *13 (D. Md. Mar. 1, 2021) (where plaintiff was uncooperative and aggressive during arrest, officer's use of a leg sweep to terminate the situation was reasonable). Courts have also upheld the use of higher levels of force in the corrections setting when used to effectuate placing an inmate in handcuffs. See, e.g., Davis v. Agosto, 89 F. App'x 523, 526 (6th Cir. 2004) (corrections officers used mace on inmate who refused to present his hands so that he could be handcuffed).

Forsyth, 472 U.S. 511, 526 (1985), and should be resolved at the earliest possible stage of litigation. Anderson v. Creighton, 483 U.S. 635, 646, n.6 (1987). Indeed, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." White v. Pauly, 137 S. Ct. 548, 551–52 (2017). The protection of qualified immunity "extends to 'all but the plainly incompetent or those who knowingly violate the law.'" Raub v. Campbell, 785 F.3d 876, 880–81 (4th Cir. 2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The safe harbor of qualified immunity ensures that public employees will not be liable for bad guesses in gray areas, but only for transgressing bright lines. Raub, 785 F.3d at 881 (citations omitted).

The Supreme Court has outlined a two-pronged test governing qualified immunity. The first prong considers whether the facts, viewed in the light most favorable to the plaintiff, make out a violation of a constitutional right. If they do, the second prong considers whether the constitutional right in question was "clearly established" at the time of the defendants' alleged violation. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). A district court has discretion to determine which prong to address first. Hunsberger v. Wood, 570 F.3d 546, 552 (4th Cir. 2009).

A clearly established right is not discussed in a generalized fashion, but instead must be defined at a high level of particularity. Wilson v. Kittoe, 337 F.3d 392, 403 (4th Cir. 2003). The Supreme Court reiterated that "clearly established law must be 'particularized' to the facts of the case ... [o]therwise, plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." White, 137 S. Ct. at 552.

> To determine whether a given officer falls into either of those two categories, a
> court must ask whether it would have been clear to a reasonable officer that the
> alleged conduct "was unlawful in the situation he confronted." If so, then the
> defendant officer must have been either incompetent or else a knowing violator of
> the law, and thus not entitled to qualified immunity. If not, however—*i.e.*, if a

18

reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

Ziglar v. Abbasi, 137 S. Ct. 1843, 1867 (2017) (citations omitted). "[I]n other words, the legal question must be 'beyond debate.'" Doe v. Rector & Visitors of George Mason Univ., 132 F. Supp. 3d 712, 725 (E.D. Va. 2015) (citing Ashcroft v. al-Kidd, 563 U.S. 731 (2011)).

Even if Monroe's constitutional rights have been violated, the defendants are entitled to qualified immunity. With respect to Massenburg, it was not clearly established that it would be a constitutional violation to deploy OC spray after an inmate continually refused to obey orders to "lockdown," clinched his fist, resisted an escort back to his cell, and broke away from another officer's grasp. During the second use of OC spray, the question would be whether it was clearly established that it would be unconstitutional to deploy OC spray after an inmate abruptly turns and lunges toward an officer, after he has had failed to comply with numerous orders to lockdown and broken free from another officer's grasp. In each instance, it was not clearly established that under the facts and circumstances the limited use of OC spray was unconstitutional.

With respect to Armstrong, it was not clearly established that it would be a constitutional violation to use a leg sweep after an inmate repeatedly refused to sit down in order to be placed in handcuffs and attempted to pull away from his grasp.

## V. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment [Dkt. No. 32], must be granted, and the defendants' motion to strike plaintiff's December 20, 2021 reply [Dkt. No. 50] will be denied as moot. In addition, Monroe's motions [Dkt. Nos. 19, 30, 38-42] will be denied. An appropriate order will issue alongside this memorandum opinion.

Entered this ___ day of _____, 2022.

19

20

Alexandria, Virginia

_____

T. S. Ellis, III
United States District Judge
